**Simeon MORIN and Delano Morin, Plaintiff,**

v.

**Barry H. TRUPIN, et al., Defendants.**

**Stewart BLAIKIE, et al., Plaintiffs,**

v.

**Barry H. TRUPIN, et al., Defendants.**

**Nos. 88 Civ. 5743 (RWS), 88 Civ. 8464 (RWS).**

United States District Court, S.D. New York.

April 13, 1989.

Adler Hindy Turner & Glasser, New York City, Manning, Raab, Dealy & Strum, New York City (William J. Dealy, of counsel), for plaintiff.

Ohrenstein & Brown, New York City (Mark J. Bunim, Geoffrey W. Heineman, of counsel), for defendant Ferber Greilsheimer, Chan & Essner & Robert Chan.

Abelson Goldston & Odesser, New York City (Edward H. Odesser, of counsel), for defendants Continental Realty Corp. and Emanuel Organek.

Jackson & Nash, New York City (Victoria A. Stewart, of counsel), for defendant Jackson Cross Co.

Summit Rovins & Feldesman, New York City (John L. Amabile, of counsel), for defendants Barry H. Trupin, Bennett W. Trupin, Gerald Schaffer, Marvin Schaffer, David Kay, Herb Silverstein, The Tara Jill Trupin 1985–B Trust, RRI Realty Corp., Stuart Stern, Jerry Bills and Pass–Through Mortgage Corp.

Gaston & Snow, New York City (Eva H. Posman, Donald N. Cohen, of counsel), for defendants Laventhol & Horwath and Elliott Lesser.

Squadron, Ellenoff, Plesent & Lehrer, New York City (Ira Lee Sorkin, of counsel), for defendant Salvatore Bucci.

Meyers Tersigni Lurie Feldman & Gray, New York City, for defendant True Management Corp., Mellon Management Corp., MHT Properties, MHT Corporation, Gary D. Rogers Charterhouse Capital Investment Corp., H. Stewart Carrico II.

## OPINION

SWEET, District Judge.

Defendants Ferber Greilsheimer Chan & Essner ("Ferber Greilsheimer") and Robert Chan ("Chan") (collectively the "Ferber Defendants") have moved pursuant to Rules 12(b)(1) and 12(b)(6) Fed.R.Civ.P. to dismiss the complaint of plaintiffs Simeon Morin ("Simeon") and Delano Morin ("Delano") (together, the "Morins") on the grounds that the count based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO") (denominated Count 3) and the common law fraud Count (denominated Count 4) fail to state claims upon which relief can be granted. The Ferber defendants have also moved pursuant to Rule 56(b) Fed.R.Civ.P. for summary judgment. Finally, the Ferber defendants have moved for sanctions pursuant to Rules 11 and 56(g) Fed.R.Civ.P. The Morins have moved pursuant to Rules 15 and 21 Fed.R.Civ.P. to amend their complaint.

In a related action, *Blaikie v. Trupin* (*"Blaikie"*), Ferber Greilsheimer, William Greilsheimer ("Greilsheimer") and Chan (collectively, the "Ferber defendants") have moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiffs' RICO Counts (denominated Counts 3 and 6), the common law fraud count (denominated Count 7), the tort count (denominated Count 8) and the breach of fiduciary duty count (denominated Count 20). They have also moved pursuant to Rule 56(b) for summary judgment, pursuant to 9(b) to dismiss plaintiffs' Third, Sixth, Seventh and Eighth counts, and pursuant to Rule 11 for sanctions.

Plaintiffs in both actions have moved to consolidate the actions, and defendants Continental Realty Corporation ("Continental") and Emanuel Organek ("Organek") have moved by letter motion to conduct discovery as to the identification of wit-

nesses and production of documents relied upon by plaintiffs in making allegations in the Consolidated Complaint.

For the reasons set forth below, the motions to dismiss the claims against the Ferber defendants are granted, as are the motions to amend the complaint, to consolidate the actions and to conduct discovery. The motion for sanctions is denied.

*The Morin Action*

The Parties and The Complaint

Ferber Greilsheimer is a New York City law firm. Chan is a member of Ferber Greilsheimer. The Morins are investors in Rothschild Realty Partners 130 Series ("Rothschild Realty" or the "Investor Partnerships").

The Complaint alleges that in November, 1985, Simeon purchased 5.75 units in Rothschild Realty in the face amount of $1,006,250. That same month, Delano purchased 2.75 units in the face amount of $467,500. In connection with these investments, the Morins executed promissory notes (the "Notes"). Between July 1986 and December 31, 1986, the Morins made payments of $345,000 on the Notes to Rothschild Realty.

According to the Complaint, the Investor Partnerships owned limited partnership interests in three organizations: Dallas Realty Associates, which owned commercial real estate in Dallas, Texas (the "Dallas Property"), Lincoln Center Associates, which owned commercial real estate in Indianapolis, Indiana (the "Indianapolis Property"), and the Mutual Home Bank Building Partnership which owned commercial real estate in Grand Rapids, Michigan (the "Grand Rapids Property") (collectively, the "Properties").

The Complaint alleges that the Morins have been defrauded in connection with their investment in the Partnerships. Principally, it alleges that the Properties were sold and resold among entities controlled by Barry Trupin at inflated prices; that the private placement memoranda for the Partnerships contained fraudulent information; that appraisals of the Properties were inflated; that financial forecasts for the Investor Partnerships were fraudulent; that

tax opinions were false; and that adverse information concerning the Properties was covered up.

On August 17, 1988, the Morins brought suit against thirty-seven defendants including the general partner of the Partnerships, the promoters of the offering of Partnership interests and their affiliates, control persons, officers, sales people, successors in interest, known employees, lawyers who worked on the offering memorandum, accountants, and appraisal companies. The defendants are accused, *inter alia*, of issuing private placement memoranda in a series of real estate tax shelters involving defendant Barry Trupin ("Trupin") and others which contained material misstatements and omissions of fact.

The Ferber Defendants are alleged to have acted as "litigation counsel" to the Partnership after the Morins made their investments. They are charged in Count 3 with violations of RICO and in Count 4 with common law fraud, and are alleged to have known about the fraud in the investment because of their activities as counsel to various entities involved in the deals, as personal counsel to Trupin, and as litigation counsel.

Although the Complaint is lengthy, the charges against the Ferber defendants are set forth in the following paragraphs:

64. Ferber Greilsheimer, acting through Robert Chan and other members or associates of such firm, acted as litigation counsel to the Investor Partnerships and American Realty Associates, for the benefit and at the direction of Barry Trupin, in seeking to collect on Investor Notes ... notwithstanding the fact that Ferber Greilsheimer knew or must have known that, as a result of the misrepresentations and omissions described herein, the makers of such Investor Notes had full and complete defenses to the payment thereof.

192. Defendants acting on behalf of Barry Trupin, including ... Ferber Greilsheimer have made constant and repeated efforts to collect sums purportedly owing in connection with the Investor

Notes, knowing that the proceeds of such efforts would be paid, and were paid, to Barry Trupin and/or his affiliates and knowing that the makers of such notes had complete defenses thereto.

195. Ferber Greilsheimer acted as litigation counsel for the Investor Partnerships, American Realty Associates, Charterhouse, and other entities controlled by Barry Trupin in collecting, or seeking to collect, sums pursuant to the Investor Notes, and has instituted numerous lawsuits, including actions on behalf of American Realty Associates against the Morins, in furtherance thereof.

196. In or about July, 1986, as a result of demands made by Ferber Greilsheimer, the Morins attended a meeting at the offices of Ferber Greilsheimer, at which Robert Chan, purportedly acting on behalf of Rothschild Realty Partners 130.-11, falsely represented to the Morins that their notes were valid, fully enforceable and subject to no defenses. Neither he nor anyone else acting on behalf of Barry Trupin made any disclosure of any of the problems that had arisen in connection with the Properties, as to none of which the Morins had any knowledge....

197. ... in reliance on the representations made in the July, 1986 meeting, and as a result of the wilful failure of Ferber Greilsheimer and other defendants to disclose the true facts concerning the subject transactions, the Morins made payments to Rothschild Realty Partners 130.11 of approximately $345,000 during the period from July, 1986 to December 31, 1986.

198. Subsequently, the Morins refused to make payments in respect of their Notes, because of their inability to receive information concerning their investment.... On October 1, 1987, Ferber Greilsheimer (Robert Chan) wrote to the plaintiffs by letter sent via the federal mails, and demanded payment on their Notes. Ferber Greilsheimer advised the plaintiffs that it was counsel to American Realty Associates and that American Realty Associates was "the holder" of their Notes. On information and belief, American Realty Associates was not the holder of the Notes. Ferber Greilsheimer knew but purposefully failed to disclose the facts as to what had occurred with respect to the Owning Partnerships, the Acquiring Partnerships and the Properties.

199. All such actions to enforce the Investor Notes have been and are a continuing and essential element of the ongoing scheme to defraud the makers of such notes.

241. Ferber Greilsheimer, acting through defendant Robert Chan and other members or associates of the firm ... has acted as attorneys for members of the Rothschild Group for several years. It was listed on a Rothschild Reserve corporate brochure in 1982 as counsel to the group. It has been intimately familiar with the tax shelter business of Barry Trupin and entities controlled by him since at least that time.

242. In July, 1986, and at other relevant times, Ferber Greilsheimer must have known many or all of the following facts: that DR Realty Associates had defaulted under the Parkway Mortgage on the Dallas Property; that a notice of Trustee's Sale of the Dallas Property had been issued and filed; that there was an undisclosed third mortgage ... on the Dallas Property; that the tenants affiliated with Parkway Venture had vacated the Dallas Property; that none of the sales of any of the Properties to or by American Realty Associates had occurred; that the financial performance and conditions of the Investor Partnerships and the Owning Partnerships were significantly different than as set forth in the Forecasts and Projections contained in the Private Placement Memoranda; and that there were many other facts concerning the Investor Partnerships and the Owning Partnerships, any or all of which would have provided a complete defense to claims against payment required by the plaintiffs on the Morin Notes.

243. Ferber Greilsheimer were responsible for the actions described in the section hereof entitled "Collection Efforts."

In addition, ¶ 267 lists Ferber Greilsheimer and Chan as among the entities and individuals who were engaged in acts of racketeering.

## The Motion to Dismiss

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Further, the complaint should be liberally construed and the allegations in the complaint should be considered in the light most favorable to plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A motion to dismiss will be granted only if it appears to be certain that the plaintiff is entitled to no relief under any set of facts which could be proved in support of the claim made. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

## The Common Law Fraud Claim

The Morins' fourth claim for relief is a claim based upon common law fraud. To establish fraud, it is necessary to show "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–1 (2d Cir. 1987). *See also Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *JoAnn Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214 (1969).

Two false representations by the Ferber defendants are alleged in the Complaint. First, at a July 1986 meeting, Chan, acting as litigation counsel, told the Morins that the Notes were "valid, fully enforceable and subject to no defenses" when he knew or should have known that there were defenses available. Compl. ¶ 196. Second, the Morins claim that a letter dated October 1, 1987 (the "October Letter") which stated that the Morins' Notes were held by American Realty Associates ("ARA") and which threatened litigation on behalf of ARA against the Morins in the absence of payment was a misrepresentation, for, like

Chan's comments at the July meeting, it did not mention the existence of defenses to the Notes. Compl. ¶ 198.

■■■ However, neither of these statements can form the basis of a common law fraud claim. To the extent that the statements were omissions, they cannot form the basis of a fraud claim because under New York law, a claim of fraud based on fraudulent omission can be maintained only when there is a duty of disclosure. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank N.A.,* 731 F.2d 112, 123 (2d Cir.1984); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 283 (2d Cir.1975). And to the extent that the statements were misrepresentations, they cannot form the basis of a fraud claim because the Morins could not have relied upon them to their detriment.

A duty to disclose arises only under the following circumstances:

> first, where the parties enjoy a fiduciary relationship ... and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 738–39 (2d Cir.1984), *quoting Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, National Ass'n,* 731 F.2d at 123. Furthermore, "a duty to disclose will not be imposed unless there is evidence that defendants were 'on notice' that plaintiffs were acting upon a mistaken belief based on inferior information." *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 773 (S.D.N.Y.1985).

■■■ The Morins did not allege the existence of a fiduciary relationship between the Morins and the Ferber defendants in their Complaint. Moreover, even if Ferber Greilsheimer was counsel to Rothschild Realty, Ferber Greilsheimer did not owe a fiduciary duty to the Morins in their role as limited partners. *See Quintel v. Citibank,* 589 F.Supp. 1235, 1241–42 (S.D.N.Y.1984) (Sweet, J.) ("To hold that a limited partner is automatically a foreseeable client of the

attorney representing the general partners or even the limited partnership, in the absence of any affirmative assumption of duty by the attorney, would ignore Ethical Consideration 5–18 which specifically defines the attorney's allegiance to the entity that retained him rather than to any person connected with the entity."). As in *Quintel*, the Complaint here is devoid of any allegation that the Morins believed that Ferber Greilsheimer was their attorney. Indeed, at the July meeting, the Morins were represented by their own counsel. There was no attorney-client relationship between the Ferber defendants and the Morins, nor did the Ferber defendants have any involvement in structuring the transaction, acquiring the underlying property, selling the Partnership units, or reviewing documents.

In addition, the Ferber defendants did not have superior knowledge or information that was not readily available to the Morins. Indeed, all of the information allegedly not disclosed by the Ferber defendants were matters of public record.

Finally, the Morins have not alleged that the Ferber defendants were on notice that the Morins were acting upon a mistaken belief based upon inferior information. As seen, at the July meeting the Morins were represented by counsel who presumably were able to learn the facts the Ferber defendants are alleged to have failed to disclose by conducting a review of public records.[1] Therefore, the Complaint fails to state a cause of action for fraud based on omission.

Similarly, if the alleged false representations of the Ferber defendants are characterized as affirmative misrepresentations rather than omissions, the Morins have failed to state a cause of action, for they have failed to plead adequately that they relied on the misrepresentations and were injured as a result.

■ The misrepresentations allegedly made at the July 1986 meeting—that the Notes were enforceable—consisted of the legal position of the Ferber defendants' clients. A party represented by counsel cannot establish justifiable reliance when the claim is premised upon the legal opinion of an adversary's counsel. *See Verschell v. Pike*, 85 A.D.2d 690, 445 N.Y.S.2d 489, 491 (2d Dep't 1981).[2]

■ As for the alleged misrepresentation in the October Letter, it could not have caused injury to the Morins, for the only damage alleged by the Morins is the $345,000 that they paid to the Partnership between July and December, 1986. This letter came ten months after the last payment, and thus could not have caused any damage.

■ Finally, the Morins have provided no authority for the proposition that counsel for the holder of a note, in negotiations to persuade the maker of the note to make payment, has a duty to disclose to the maker facts that occurred after the notes were signed which might serve as the basis for a defense to a suit on the Notes. Thus, the claim of fraud based upon the July 1986 meeting and the October 1987 letter must fail as a matter of law.

*The RICO Claim*

The Morins' third claim for relief is a RICO claim. As the Court of Appeals for the Second Circuit has explained, to state a claim under RICO, a plaintiff must allege that the defendant has violated 18 U.S.C. § 1962.[3] To do this, the plaintiff must

---

**1.** Also present at the July meeting was the Morin's alleged investment advisor, defendant George Cohen and his attorney, and two other defendants.

**2.** In any case, it is not clear that the facts about which the Morins say the Ferber defendants must have known would constitute a defense to a suit on the Notes. They allegedly came about after the Morins signed their Notes in November of 1985, and thus cannot form the basis of a

defense of fraud in the inducement to a suit on the Notes.

**3.** 18 U.S.C. § 1962(c) makes it unlawful, in pertinent part:
for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

allege the existence of seven constituent elements:

(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom., Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). In addition, the plaintiff must allege that he was "injured in his business or property by reason of a violation of Section 1962." 18 U.S.C. § 1964(c). Because the Morins have failed to allege two or more acts constituting a pattern of racketeering activity, and because they did not properly allege that they were injured by reason of a violation of § 1962, their RICO claim against Ferber Greilsheimer and Chan must be dismissed.

■ A proper pleading of predicate acts based on mail and wire fraud requires an allegation of an underlying fraudulent scheme. *See In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 512 (S.D.N.Y.1987), *River Plate Reinsurance Co., Ltd. v. Jay-Mar Group, Ltd.*, 588 F.Supp. 23, 27 (S.D.N.Y.1984). Where the fraudulent scheme is premised upon inadequate pleading of common law fraud, the allegations of mail and wire fraud must also fall. *River Plate Reinsurance Company, Ltd.*, 588 F.Supp. at 25–27. Thus, the Morins' pleading of the predicate RICO claim must fall, for, as described above, the Complaint does not properly allege that the Ferber defendants engaged in any "fraud" or "fraudulent scheme." Because the common law fraud is dismissed, there are no valid allegations of "fraud" to underpin the Morins' RICO allegations and those claims must be dismissed as well.

However, even if the fraud claim were viable, the RICO claim must fall, for the Complaint does not allege two acts that can serve as the basis for a RICO claim. The acts of racketeering activity alleged by the Morins consist of the Ferber defendants'

activities on behalf of ARA and the Partnership to collect payment on the Notes, in particular, the July 1986 meeting and the October 1987 letter.

■ The statements made at the July meeting cannot violate the wire or mail fraud statutes, and so cannot form the RICO predicate act. Therefore, the Complaint is down to one predicate act, the October Letter, which is insufficient to sustain a RICO claim. Indeed, the October Letter's demand that the Morins make payments on the Notes cannot serve as a predicate act, for it does not constitute mail fraud. As the District Court for the Northern District of Illinois has said:

Congress could not have intended that the mail fraud statute sweep up correspondence between attorneys, dealing at arm's length on behalf of their parties, concerning an issue in pending litigation.... Subjecting the letters in issue to the mail fraud statute would chill an attorney's efforts and duty to represent his or her client in the course of pending litigation.

*Spiegel v. Continental Illinois National Bank*, 609 F.Supp. 1083, 1089 (N.D.Ill. 1985), *aff'd*, 790 F.2d 638 (7th Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986) (RICO claims were premised on the alleged mismanagement of a trust by the defendant bank. The predicate acts of mail fraud were two letters written by the bank's attorneys stating that the bank was applying some of the trust's assets to pay the fees it had incurred in litigation over the trust. The Court, in dismissing the complaint, ruled that this correspondence could not, as a matter of law, constitute mail fraud).

■ Furthermore, although attorneys are not immune from liability simply because they represent a client, *see S.E.C. v. Frank*, 388 F.2d 486, 489 (2d Cir.1968); *Newburger Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1080 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978), legitimate acts of attorneys on behalf of clients cannot form the basis of a RICO claim. In *Paul S. Mullin & Assoc., Inc. v. Bassett*, 632 F.Supp. 532 (D.Del.

1986), plaintiffs, controllers of a financial planning company, premised a RICO claim on allegations that defendants had converted plaintiffs' business and usurped its clients. Among the alleged acts of fraud was a letter by defendants' attorneys to a prospective purchaser of plaintiffs' business, which recited defendants' position that certain of plaintiffs' client files were defendants' property and should be returned. The Court rejected plaintiffs' argument that this letter constituted a RICO predicate crime, stating:

> The Court finds absurd plaintiffs' apparent suggestion that a lawyer's act in posting a letter which states a client's legal position in a dispute can constitute mail fraud. If such were the situation, every dispute in which the parties' counsel exchanged letters could give rise to RICO litigation.

632 F.Supp. at 540.

Moreover, the threat by an attorney to bring a lawsuit is not a predicate RICO act. In *I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265 (8th Cir.1984), the Court of Appeals for the Eighth Circuit rejected a RICO claim in a case in which plaintiff's subsidiary, which had leased certain vessels, became insolvent. An attorney for the defendant shipowners stated that if plaintiff did not pay its subsidiary's debts or inject new capital into the lessee, the shipowners would sue plaintiff and its principal lender. Plaintiff, contending that these statements amounted to extortion, brought a RICO action against the shipowners. The Court, in upholding the dismissal of the complaint, ruled that the conduct complained of could not be the basis of a RICO claim:

> if we were to hold that two threats to file a civil action, or ... one threat to file a civil action and one instance of travel for the purpose of making such a threat, constituted a 'pattern of racketeering activity,' citizens and foreigners alike might feel that their right of access to the courts of this country had been severely chilled.

Thus, because the Complaint fails to allege two predicate acts, the RICO claim must be dismissed.[4]

Finally, in order to maintain a RICO claim against the Ferber defendants, it is necessary to plead and prove that plaintiffs were damaged as a result of the Ferber defendants' RICO violations. Title 18 U.S. C. § 1964(c), which authorizes private RICO suits, is available only if the plaintiff has been "injured in his business or property by reason of a violation of section 1962...." According to the Supreme Court, "the plaintiff only has standing if, and can recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed. 2d 346 (1985). *See also Burdick v. American Express Co.*, 865 F.2d 527, 529 (2nd Cir.1989); *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 511 (S.D.N.Y.1987) (plaintiffs "must show that they were injured in their business or property by reason of the violations of section 1962(c).").

The Morins have failed to allege any damage "by reason of" RICO violations by the Ferber defendants. The damages alleged by the Morins consist of the $345,000 paid to the Partnership from July 1986 to December 31, 1986. However, as seen, the only possible act of racketeering by the Ferber Defendants was the October 1, 1987 letter, written ten months after plaintiffs made their last payment to the partnership. The Morins could not have relied on this letter to their detriment and did not suffer any damages because of it. In view of the absence of an allegation of causation, the RICO claim must fail.

The Ferber defendants have also moved for summary judgment. Because the 12(b)(6) motion is granted, there is no need to consider the summary judgment claim.

*The Blaikie Action*

The Parties and The Complaint

Like plaintiffs in *Morin v. Trupin* ("Morin"), plaintiffs in *Blaikie* are investors in

---

**4.** Because the Complaint does not sufficiently allege two predicate acts, it is not necessary to consider whether the acts constitute a pattern of racketeering activity, and thus the decision in *Beauford v. Helmsley*, 865 F.2d 1386 (2nd Cir. 1989), does not affect this case.

tax advantaged limited partnerships (the "Investor Partnerships") which owned limited partnership interests in organizations (the "Owning Partnerships") owning real estate located in Dallas, Indianapolis, and Grand Rapids. Partnerships involved in *Blaikie* also owned interests in property in Sarasota, Florida (the "Sarasota Property") (collectively, the "Properties").

The gravamen of plaintiffs' claim is that they were defrauded in connection with the sale of the limited partnership interests. As in *Morin*, the Complaint alleges that defendants in *Blaikie* issued private placement memoranda in a series of Real Estate Tax Shelters involving Trupin and the other defendants which contained material misstatements and omissions of fact, used fraudulent means to obtain financing, arranged for the sale and resale of the Properties and goods between and among related entities, placed massive mortgage debts on the Properties, made fraudulent forecasts and projections, provided fraudulent representations as to tax treatments, bribed advisors of potential investors to recommend the investment, siphoned the proceeds of the transactions, and covered up problems to prevent investors form discovering the fraud.

Forty-four of the fifty-four defendants are alleged to have played some role in the structuring of the entities in which plaintiffs invested or in the sale of units in the entities (the "Securities Defendants"). The Securities Defendants include two law firms, six lawyers, two accounting firms and four accountants, but do not include the Ferber defendants.

It is alleged that the Ferber Defendants knew about the fraud because of their activities as counsel to various entities involved in the deals as well as acting as litigation counsel in several matters. The 159 page, 420 paragraph *Blaikie* Complaint accuses the Ferber defendants of the following:

112. In early 1987, Barry Trupin, Ferber Greilsheimer and others caused the shares of stock of the corporate general partner of each of the ... Partnerships to be sold to Charterhouse, in order to insulate and remove Barry Trupin and others from liability and responsibility for the affairs of the ... Partnerships and to hinder the investors' discovery of the fraud....

115. In 1987, Rothschild Group entities closed their offices and ceased to engage openly in business. Those acting on behalf of such entities, including Ferber Greilsheimer and others, falsely represented to creditors of such entities that there were no funds or other assets with which to pay the debts of such entities....

256. On or about March 13, 1987, pursuant to a conspiracy between and among Barry Trupin ... Ferber Greilsheimer ... and others, Charterhouse became the nominal owner of the shares of stock of Tru Management Corp. (the general partner of each of the Investor Partnerships) and MHT Properties Corp. (the general partner of the Owning Partnerships), without the payment of any consideration.... These transactions were designed ... to insulate and remove Barry Trupin and others from liability and responsibility for the affairs of the Owning Partnerships and the Investor Partnerships and to hinder the investors' discovery of what had occurred with respect to their investments.

263. Although the Investor Notes and the Airjet Investor Notes, including those of the plaintiffs, were assets of the Investor Partnerships, they have been used and converted to and for the benefit of Barry Trupin and others, by defendants Barry Trupin, ... and Ferber Greilsheimer, who have conspired with and among each other to take the following actions.

273. Defendants acting on behalf of Barry Trupin, including ... Ferber Greilsheimer have made constant and repeated efforts to collect sums purportedly owing in connection with the Investor Notes and the Airjet Investor Notes, knowing that the proceeds of such efforts would be paid, and were paid, to Barry Trupin and/or his affiliates and knowing that the makers of such notes had complete defenses thereof.

275. ... in furtherance of such efforts, Barry Trupin and those acting in concert with him made repeated demands for payment on the Investor Notes and the Airjet Investor Notes but purposefully failed to disclose to the investors of the existence of any problems relating to the Investor Partnerships, the Airjet Trusts, the Properties or the Helicopters, in violation of their fiduciary and contractual responsibilities, and represented to the investors, including plaintiffs, throughout 1986 and 1987, that such entities were operating successfully.

276. In further support of such efforts, Barry Trupin and those acting with him, including ... Ferber Greilsheimer, devised a scheme to deceive the investors ... into believing that the Investor Notes held by a Rothschild Group entity had been assigned to an unrelated holder in due course....

277. Also, in furtherance of such effort ... Rothschild Group entities, with the assistance of Ferber Greilsheimer, instituted numerous lawsuits against investors, in which they falsely represented to the investors and the Court that the investors were justly indebted to the plaintiffs ... and there were no meritorious defenses to the actions....

278. Ferber Greilsheimer acted as counsel for the Investor Partnerships, the Airjet Trusts, American Realty Associates, Charterhouse, Pass–Through, and other entities controlled by Barry Trupin in collecting, or seeking to collect, for the benefit of Barry Trupin, sums pursuant to the ... Notes....

279. All such actions to enforce the Investor Notes and the Airjet Investor Notes have been and are a continuing and essential element of the ongoing scheme to defraud the makers of such notes.

332. Ferber Greilsheimer, acting through defendants William Greilsheimer ("Greilsheimer"), Robert Chan and other members or associates of the firm, has acted as attorneys for members of the Rothschild Group since the Rothschild Group was first organized. One of its founding partners, Greilsheimer, has act- ed as Barry Trupin's personal attorney since at least 1976, when Barry Trupin first entered the syndication business. Greilsheimer is and has been, since in or about 1976, Barry Trupin's trusted confidante and adviser, and is and has been in constant communication with Barry Trupin concerning his business activities, including all of the subject transactions. Ferber Greilsheimer is and has continuously been intimately familiar with the tax shelter business of Barry Trupin and entities controlled by him. It acted on his behalf in planning the restructuring of his syndication business in or about 1980, handled Barry Trupin's pre-nuptial agreement, acted on his behalf with regard to the proposed acquisition of a savings and loan association in California and has handled voluminous litigation on behalf of Barry Trupin and entities controlled by him.

333. At all relevant times, Ferber Greilsheimer knew many or all of the following facts: that DR Realty Associates had defaulted under the Parkway Mortgage on the Dallas Property; that a Notice of Trustee's Sale of the Dallas Property had been issued and failed; that there was an undisclosed third mortgage (the "Boulevard Mortgage") on the Dallas Property; that the tenants affiliated with the Parkway Venture had vacated the Dallas Property; that none of the sales of any of the Properties to or by American Realty Associates had occurred; that the financial performance and conditions of the Investor Partnerships and the Owning Partnerships were significantly different than as set forth in the Forecasts and Projections contained in the Private Placement Memoranda; that Barry Trupin was improperly and unlawfully diverting the assets of the Investor Partnerships and the Owning Partnerships for his own purposes, including his acquisition of Constitution; that it was the common and continuing practice of Rothschild Group entities to commingle funds derived from their real estate and other ventures, to use cash flow from such entities to pay obligations of others

and to convert such cash flow to the personal use of Barry Trupin and his wife, Renee Trupin, so as to maintain their lavish lifestyle; and that there were many other facts concerning the Investor Partnerships and the Owning Partnerships, any or all of which would have provided a complete defense to claims against payment required by the plaintiffs.

334. Ferber Greilsheimer was responsible for the actions described in the section hereof entitled "Collection Efforts...."

335. Ferber Greilsheimer acted on behalf of Barry Trupin in 1986 and 1987 in structuring, negotiating and implementing the fraudulent sale of the stock of Tru Management Corp. and MHT Properties Corp. to Charterhouse, as described in the section hereof entitled "Charterhouse"....

336. Ferber Greilsheimer was responsible for creating the maze of entities described in the section hereof entitled "Alter Egos"....

337. In return for its services, Ferber Greilsheimer received substantial fees from entities controlled by Barry Trupin (the firm's largest client)....

338. On information and belief, in connection with and in furtherance of all such activities, and at all relevant times, Ferber Greilsheimer made repeated and regular use of the federal mails and interstate wires in (a) communicating with Barry Trupin, Keith Holmes and others, in early 1987, concerning the sale of stocks of Tru Management Corp. and MHT Properties Corp. to Charterhouse, (b) demanding and sometimes procuring payment from investors in 1986, 1987 and 1988, in respect of their Investor Notes and Airjet Investor Notes, (c) communicating with Jerry Bills in 1987 and 1988 concerning the efforts of Pass–Through and Jerry Bills to pressure investors, including plaintiffs, into making payments in respect of their Investor Notes and Airjet Investor Notes at a time when Ferber Greilsheimer knew that there were absolute defenses to the making of such payments, and (d) communicating with Barry Trupin, Keith Holmes and others concerning the acquisition by Barry Trupin's entities of a controlling interest in Constitution, and (e) on a continuing basis, handling matters concerning the organization of the maze of Rothschild Group entities and the disposition of the assets thereof.

352. Barry Trupin, with the assistance of Ferber Greilsheimer ... and others, created a maze of hundreds of corporations, partnerships and trusts, almost all of which were in the names of other entities or stooges of Barry Trupin, but which were, in fact, controlled by Barry Trupin, to operate the business of the Rothschild Group.

The Complaint further alleges that the maze of entities was created to hinder and delay claims of creditors doing business with Rothschild Group entities, as well as investors in tax shelter entities, to divert the assets to Barry Trupin, to conceal fraudulent conduct, and to conceal Barry Trupin's ownership of various items of property. Compl. ¶ 353.

In paragraphs 369 and 370 of the Complaint, the defendants alleged to have committed the acts of racketeering are specifically identified, and include the Ferber defendants.

### The Common Law Fraud Claim

■ As in *Morin*, the Complaint in *Blaikie* fails to state a cause of action against the Ferber defendants for common law fraud. Apart from ¶ 115, the Complaint does not claim that the Ferber defendants had communications with any of the plaintiffs, thus any fraudulent representation would be in the form of an omission. However, as seen above, a claim based on fraudulent omission can be maintained only where the parties are in a fiduciary relationship or where one party possesses superior knowledge not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. Furthermore, defendants must have been "on notice" that plaintiffs were acting upon a mistaken belief based upon inferior information.

■ Here, as in *Morin*, plaintiffs have not alleged a fiduciary relationship between themselves and the Ferber defendants. In fact, plaintiffs never had any contact with the Ferber defendants. Further, there is no contention in the Complaint that the Ferber defendants were "on notice" that the 36 plaintiffs were acting on a mistaken belief based on inferior information when they invested in the Partnerships. Indeed, the Ferber defendants are not alleged to have played a role in structuring the Partnerships in which plaintiffs invested, or drafting or reviewing any tax opinion, legal opinion, investment memorandum or other document used in the sale of securities to the plaintiffs.

■ The only misrepresentation that could be actionable is the statement in ¶ 115 of the Complaint that Ferber Greilsheimer, among others, falsely represented to creditors of Rothschild Group entities that there were no assets with which to pay off debts. However, the Complaint does not allege that this misrepresentation was made to the plaintiffs. Further, there is no allegation of reliance or injury. Thus, it cannot serve as the basis of a fraud claim against Ferber Greilsheimer.

As for the "Charterhouse Sale" in which the Ferber defendants represented Trupin, not only have plaintiffs not alleged that any misrepresentations or omission were made, but plaintiffs did not allege that they were harmed by the transaction. Thus, it cannot form the basis of a fraud claim.

■ In addition, plaintiffs have failed to allege scienter with particularity, maintaining only that Ferber Greilsheimer has acted as attorneys for the Rothschild Group, that Greilsheimer has been Barry Trupin's personal attorney since 1976, as well as his "trusted confidante and advisor," Compl. ¶ 332, and that he has been in constant communication with Barry Trupin concerning his business activities. This is insufficient conjecture to form the basis of a fraud claim:

> plaintiffs can be required to supply a factual basis for their conclusory allegations regarding ... [defendant's] knowledge. It is reasonable to require that the

plaintiffs specifically plead those events which they assert give rise to a strong inference that the defendants had knowledge of the facts contained in ... the complaint or recklessly disregarded their existence.

*Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 558 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

■ Furthermore, merely alleging that a professional has performed services for other defendants is an insufficient basis for inferring scienter. *See Dannenberg v. Dorison*, 603 F.Supp. 1238, 1241 (S.D.N.Y. 1985) (even though plaintiffs had alleged that defendant law firm had prepared numerous tax opinions for fraudulent tax shelters promoted by the same individuals, the pleading was still deficient under Rule 9(b)); *Polycast Technology Corp. v. Uniroyal, Inc.* [Current] Fed.Sec.L.Rep. (CCH) ¶ 94,005 at 90,694 (S.D.N.Y. August 25, 1988) (insider status of investment banker did not raise an inference of scienter where complaint did not specify what bank did during negotiations, and did not allege that bank participated in drafting documents, for "[t]he fact that one is an insider of an organization does not necessarily make one privy to every scheme hatched there."). Therefore, *Blaikie* plaintiffs have failed to plead scienter adequately, and their fraud claim against the Ferber defendants, count 7, must be dismissed.

### The RICO Claim

As in *Morin*, plaintiffs have failed to plead adequately that the Ferber defendants committed two RICO predicate acts, and thus their RICO claims, counts 3 and 6, must be dismissed. The only apparent predicate crimes alleged against the Ferber defendants are mail fraud and wire fraud pursuant to 18 U.S.C. § 1341 and § 1343, respectively. In order to establish that a defendant has committed an indictable offense under the federal mail and wire fraud statutes, a plaintiff must allege (and prove) "(1) the existence of a scheme to defraud, and (2) the use of the mails or interstate wires in furtherance of the fraudulent scheme." *In re Gas Reclama-*

*tion, Inc., Securities Litigation,* 659 F.Supp. 493, 512 (S.D.N.Y.1987) (citation omitted).

▮ It is well-settled that where, as here, the predicate crimes of a RICO claim sound in fraud, the pleading of those predicate acts must satisfy the strictures of Fed.R.Civ.Proc. 9(b). *See The Limited, Inc. v. McCrory Corp.,* 645 F.Supp. 1038, 1041 (S.D.N.Y.1986); *Equitable Life Assurance Society v. Alexander Grant & Co.,* 627 F.Supp. 1023, 1028 (S.D.N.Y.1985). Rule 9(b), applied in this context, requires that specification of the time, place, speaker and content of the alleged misrepresentations, *see Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986); *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1172 (S.D.N.Y.1985), a sufficient showing of fraudulent intent, *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49–51 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Anitora Travel, Inc. v. Lapian,* 677 F.Supp. 209, 214 (S.D.N.Y.1988), and the specifics of the use of the mails and wires. *Frota v. Prudential–Bache Securities, Inc.,* 639 F.Supp. 1186, 1192 (S.D.N.Y.1986).

Therefore, "bare allegations of 'conspiracy' . . . are insufficient to support a civil RICO claim...." *Grunwald v. Bornfreund,* 668 F.Supp. 128, 133 (E.D.N.Y. 1987). Indeed, even a "mere [allegation of an] agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)." *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d 786, 792 n. 8 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Rather, a plaintiff "must show that the defendants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 567 F.Supp. 1146, 1154–55 (D.N.J.1983). Finally, the plaintiffs' "allegations must delineate among the defendants as to their participation or responsibilities in making the statements which are the subject of the suit." *Rush v. Oppenheimer & Co., Inc.,* 628 F.Supp.

1188, 1198 n. 5 (S.D.N.Y.1985), *quoting Van Schaick v. Church of Scientology,* 535 F.Supp. 1125, 1141 (D.Mass.1982).

▮ Plaintiffs' contention that the Ferber defendants have conspired in violation of 18 U.S.C. § 1962(d) consists of the following:

381. The defendants conspired with each other to violate 18 U.S.C. Sec. 1962(a), (b) and (c).

This allegation is insufficient to state a claim under 18 U.S.C. § 1962(d). Nowhere have plaintiffs alleged that the Ferber defendants committed or agreed to commit two or more RICO predicate acts. Plaintiffs' description of the moving defendants' purported predicate acts is the following:

338. On information and belief . . . Ferber Greilsheimer made repeated and regular use of the federal mails and interstate wires in (a) communicating with Barry Trupin, Keith Homes and others, in early 1987, concerning the sale of stocks of Tru Management Corp. and MHT Properties Corp. to Charterhouse, (b) demanding and sometimes procuring payment from investors in 1986, 1987, and 1988, in respect of their Investor Notes and Airjet Investors Notes, (c) communicating with Jerry Bills in 1987 and 1988 concerning the efforts of Pass–Through and Jerry Bills to pressure investors, including plaintiffs, into making payments, and (d) communicating with Barry Trupin, Keith Holmes and others concerning the acquisition by Barry Trupin's entities of a controlling interest in Constitution, and (e) on a continuing basis, handling matters concerning the organization of the maze of Rothschild Group entities and the disposition of the assets thereof.

However, this pleading does not adequately set forth the requisite acts. First, plaintiffs have not alleged how communications concerning sales to Charterhouse furthered any "fraudulent scheme." And, as seen, the Charterhouse Sale does not constitute actionable fraud, for plaintiffs do not allege that they were harmed by it.

Second, as for demanding payment of Notes from investors, plaintiffs have not

identified any communications between plaintiffs and the Ferber defendants that can serve as predicate acts, much less allege that these communications induced plaintiffs to make any additional payments.

■ Third, as for allegations of other communications, plaintiffs have neither identified the content of these communications nor described how these communications furthered any fraudulent scheme. Moreover, nowhere in paragraph 338.5 have plaintiffs specifically identified by date or content any specific use of the interstate mails or wires by the Ferber defendants. Thus, because plaintiffs have not alleged predicate acts adequately, the RICO claims must fail.

■ Finally, the Blaikie plaintiffs have not alleged any injury as a result of conduct by the Ferber defendants, and thus the RICO claim must be dismissed. The only damages that can be deduced from the Complaint are plaintiffs' investments "as a result of and in reliance on the misrepresentations and omissions of the Securities Defendants." However, the Ferber defendants were not named as Securities Defendants. Compl. ¶ 116. Nowhere have plaintiffs alleged that they made their initial investments as the result of anything the Ferber defendants did or said, or that they made any subsequent payments as the result of anything the Ferber defendants did or said. Indeed, plaintiffs have not identified any communications between themselves and the Ferber defendants. Plaintiffs have not alleged that they suffered any damage as the result of the Ferber defendants' activities in the Charterhouse sale or Trupin's investment in a savings and loan. Therefore, the RICO claim is dismissed against the Ferber defendants.

*Aiding and Abetting Tortious Conduct and Breach of Fiduciary Duty*

Plaintiffs have attempted to allege two separate claims of aiding and abetting liability against the Ferber defendants—a general claim that the Ferber defendants aided and abetted all of the tortious conduct of the other defendants, Compl. ¶ 385, and a narrower contention that the Ferber defendants aided and abetted the purported breaches of fiduciary duty by defendant Tru Management Corp. Compl. ¶ 411.

To maintain a claim for aiding and abetting, plaintiffs must show:

(1) the existence of a . . . violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation.

*Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F.Supp. 1066, 1082 (S.D.N.Y. 1987). Plaintiffs must also sufficiently allege that its injury was "a direct or reasonably foreseeable result" of the conduct complained of. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir.1985).

■ Plaintiffs' assertion of aiding and abetting liability in its eighth (tort) claim for relief is insufficient on its face. The pleading consists of the following:

385. Defendants. . . . [16 others] and Ferber Greilsheimer, provided substantial assistance and encouragement to other defendants in connection with and in furtherance of the commission of the tortious conduct described herein and in connection with the breaches by such other defendants of duties owed by them to the plaintiffs.

Even assuming that plaintiffs have properly pled a primary violation, they have not identified which of the other defendants Ferber defendants allegedly aided and abetted. Nor have they identified what knowledge the Ferber defendants had of the violations by these unidentified defendants, nor what assistance was purportedly lent by the Ferber defendants, to these unidentified defendants. Similarly, plaintiffs have not indicated how their alleged injuries were caused by the Ferber defendants' alleged aiding and abetting.

■ Furthermore, to the extent that the underlying primary violations are based on fraud, allegations of aider-abettor liability must meet the requirements of Fed.R. Civ.Proc. 9(b). *See Dickens v. Chemical*

*Bank,* 573 F.Supp. 1129 (S.D.N.Y.1983). The Court of Appeals for the Second Circuit has held that conclusory assertions of aider-abettor liability which refer to the general charges of wrongdoing are insufficient. *See Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119 (2d Cir.1982) (allegations of aider-abettor liability were dismissed on the grounds of being "so broad and conclusory as to be meaningless."). Here, where there are 51 other defendants, and where plaintiffs have not advised the Ferber defendants of exactly which defendants' misdeeds they allegedly aided and abetted, the claim is too broad to be sustained. Thus, the eighth claim is dismissed against Ferber Greilsheimer.

In their twentieth claim, plaintiffs have alleged that the Ferber defendants aided and abetted the purported breaches of fiduciary duty by defendant Tru Management. Those breaches of fiduciary duty include:

410.   (a) It failed to disclose to the plaintiffs any of the misrepresentations and omissions set forth in the Private Placement Memoranda;

(b) it subsequently failed to correct any such misrepresentations and omissions;

(c) it failed to correct any of the continuing untruthful information concerning the affairs of the Investor Partnerships that was supplied to the plaintiffs after their purchase of limited partnership investments;

(d) it breached its obligation to consult with and give notice to the plaintiffs before allowing or causing a foreclosure of the Properties;

(e) it transferred its general partnership interests to Charterhouse in violation of the obligation of a general partner not to transfer the general partnership interest to a third party without any prior disclosure to limited partners of any intent to make such a transfer or of the identity or experience of the transferee;

(f) it failed to provide any information or financial reports to the plaintiffs concerning the operation of the Investor Partnerships or the Properties;

(g) it induced the plaintiffs to make additional payments in respect to the Investor Notes, without advising them of the serious problems that had occurred with respect to their investment; and

(h) it assigned Investor Notes belonging to the Investor partnerships to American Realty Associates or other entities in order to divert assets of the Investor Partnerships to other entities controlled by Barry Trupin.

In essence, the basis of the aiding and abetting claim is that the Ferber defendants did not blow the whistle on their clients. However, this does not constitute actionable aiding and abetting. *See Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986) ("[n]either lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose."). Furthermore, mere knowledge and approval of the primary wrongdoing does not constitute substantial assistance. *See Armstrong v. McAlpin,* 699 F.2d 79, 92 (2d Cir.1983) ("awareness and approval, standing alone, do not constitute substantial assistance.").

In the context of aiding and abetting, where the primary violations consist of either misrepresentations in, or omissions from, a document, the substantial assistance must relate to the preparation or dissemination of the document itself. *See Terrydale Liquidating Trust v. Gramlich,* 549 F.Supp. 529, 531 (S.D.N.Y.1982). Here, no such substantial assistance can be alleged, since plaintiffs acknowledge that the Ferber defendants had no involvement in the preparation or dissemination of the offending documents. Further, plaintiffs have not alleged that the Ferber defendants lent "substantial assistance" to the transgressions delineated in subparagraphs (a) through (d) and (f) through (h).

As for subparagraphs (b), (c), (f), and (g), failure to correct untruthful information or provide information, the Ferber defendants' silence cannot constitute substantial assistance, for inaction or silence can only be the basis of a claim of substantial assistance when the alleged aider and abettor either has a duty of disclosure, *see The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 401 (S.D.N.Y.1988), or has a

"high conscious intent" to aid the primary wrongdoing. *See In re Union Carbide Corp. Consumer Products Business Securities Litigation,* 666 F.Supp. 547, 563 (S.D.N.Y.1987). In this case, the Ferber defendants had no duty of disclosure to plaintiffs, *see Quintel Corp. v. Citibank, N.A.,* 589 F.Supp. 1235 (S.D.N.Y.1984), and plaintiffs have not alleged that the Ferber defendants' silence was consciously intended to aid the alleged wrongdoing.

As for the allegations in subparagraphs (d) and (h), plaintiffs have not alleged that the Ferber defendants had any involvement with the foreclosure of the properties or the assignment of Notes executed by investors. Finally, as for the allegations in subparagraph (e), plaintiffs have not alleged that they were injured by this transaction. Thus, the "aiding and abetting" claim is dismissed.

As in *Morin,* the Ferber defendants have also moved for summary judgment. Because the 12(b)(6) motion is granted, there is no need to consider the summary judgment claim.

### Rule 11 Sanctions

Rule 11 requires an attorney to make a "reasonable inquiry" to determine that pleadings and motions are "well grounded in fact" and "warranted by existing law" or constitute "a good faith argument for the extension, modification, or reversal of existing law," and that they are not interposed for the purpose of harassment or delay. According to the Court of Appeals for the Second Circuit,

> If the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate. On the other hand, if the attorney either failed to make an objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry, then sanctions are appropriate.

*Calloway v. The Marvel Entertainment Group,* 854 F.2d 1452, 1470 (2d Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989). Nothing in the facts indicates that plaintiffs in *Morin* or in *Blaikie* have failed to make an objectively

reasonable inquiry into the basis of their claims. Thus, the motion for Rule 11 sanctions is denied. Similarly, the motion for sanctions pursuant to Rule 56(g) is denied.

### *The Motion to Amend the Complaint, the Motion to Consolidate and the Motion to Conduct Discovery*

At the hearing on February 10, 1989, plaintiffs' motion to amend the complaint was granted. Pursuant to the Order dated April 7, 1989, plaintiffs' motion to consolidate *Morin* and *Blaikie* was granted. A Consolidated Complaint was filed on February 24, 1989.

As for Continental's and Organek's motion to conduct discovery as to the identification of witnesses and the production of documents relied upon by plaintiffs in making the allegations in the complaints, it is granted.

### *Conclusion*

For the reasons set forth above, the Ferber defendants' motions to dismiss the claims against them in *Morin* and *Blaikie* are granted, as are the motion to amend the complaint, to consolidate the actions and to conduct discovery. The motion for sanctions is denied.

Submit order on notice.

It is so ordered.